**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ROBERT V.,[1]** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 22 C 1601** |
| | ) | |
| v. | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **KILOLO KIJAKAZI,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff applied for Disability Insurance Benefits and Supplemental Security Income under Titles II and XVI, respectively, of the Social Security Act, 42 U.S.C. §§416(I), 423, 1381a, 1382c just over three years ago in June of 2019. (Administrative Record (R.) 284-97). He claimed that he had been disabled since July 6, 2014 (R. 285) due to epilepsy, migraines, mood disorder, anxiety, fibromyalgia, and hypertension. (R. 326). Over the next two and a half years, plaintiff's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council. It is the ALJ's decision that is before the court for review. See 20 C.F.R. §§404.955; 404.981. Plaintiff filed suit under 42 U.S.C. § 405(g) on March 28, 2022, and the parties consented to my jurisdiction pursuant to 28 U.S.C. § 636(c) on April 8, 2022. [Dkt. #5]. Plaintiff asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and the first initial of their last name.

**I.**

**A.**

Plaintiff was born on September 15, 1992 (R. 285), making him just twenty-one years old at the time he claims he became unable to work, and just twenty-eight years old at the time of the ALJ's decision. After an administrative hearing at which plaintiff, represented by counsel testified, along with a medical expert and a vocational expert, the ALJ determined the plaintiff had the following severe impairments: seizures, fibromyalgia, opioid use/dependence disorder, cocaine use disorder, bipolar/depression, anxiety, attention deficit hyperactivity disorder, right shoulder degenerative joint disease, and lumbar spine degenerative disc disease. (R. 18). The ALJ found that additional impairments were non-severe. (R. 18-19). The ALJ then found plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, focusing on the listings that applied to musculoskeletal disorders (1.15, 1.16, 1.18, and 1.19), mental impairments (12.04, 12.06, 12.08, and 12.11), and epilepsy (11.02), and inflammatory arthritis (14.09). (R. 18-19).

The ALJ then determined that plaintiff could perform light work with the following additional limitations:

> he can never climb ladders, ropes, or scaffolds. He can occasionally climb ramps and stairs. He can frequently balance, stoop, kneel, crouch, and crawl. He can occasionally reach overhead with the right upper extremity. He needs to avoid work involving hazards of unprotected heights, dangerous moving machinery, and no driving as part of the work. He can learn, understand, remember, and carry out simple work instructions, sustain attention and concentration for simple work tasks, and make simple work related decisions. He can interact occasionally with co-workers and the general public. He can tolerate typical unskilled work type of supervision (supervisor or designee introduction of work tasks, following the introductory period,

2

then occasional work related interactions thereafter). He can perform in a routine work environment with no more than occasional changes, and with avoidance of fast production rate or hourly job quotas.

(R. 20-21).

The ALJ then summarized the medical evidence at length. There was a record of marijuana abuse, as well as prescription drug abuse. There was a history of treatment for seizures, with objective studies and neurological exams, in the main, being normal. There were also lengthy periods where plaintiff indicated he was seizure-free. (R. 21-22, 24-28). There was a thorough neuropsychological evaluation which was normal, with the exception of decreased verbal memory as well as variable attention/working memory and processing speed. (R. 29). There was treatment for a right shoulder injury suffered during a fall during a seizure. (R. 23). And there were therapy sessions for mental impairments and drug abuse. (R. 26-28). The ALJ – relying mostly on the medical record, plaintiff's inconsistent statements, and activities – found that plaintiff's "medically determinable impairments could reasonably cause [his] alleged symptoms; however, the [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. 21).

The ALJ went over the testimony of the medical expert who reviewed plaintiff's medical record at some length, (R. 32-33), and accepted his opinions and explanations as persuasive, but found the medical evidence did not support that the plaintiff was more limited than Dr. Goldstein found, noting the doctor was a neurologist and familiar with the record. (R. 33). The ALJ rejected the opinions of a number of other treating sources, especially those of a trio of therapists, for varying reasons, such as the lack of any support from treatment notes. (R. 34-35).

3

Next, the ALJ, relying on the testimony of the vocational expert, found that plaintiff could no longer perform his past medium work as a deliverer, as it required driving. (R. 37). But, again relying on the testimony of the vocational expert, the ALJ found there were other jobs plaintiff could still perform which existed in significant numbers in the national economy: marker, DOT No. 209.587-034, SVP 2, 150,000 positions nationally; inspector, hand packager, DOT No. 559.687-074, SVP 2, 100,000 positions nationally; and label coder, DOT No. 920.587-014, SVP 2, 70,000 positions nationally. (R. 38). Accordingly, the ALJ found plaintiff not disabled and not entitled to benefits under the Act. (R. 38).

## II.

The court's review of the ALJ's decision is "extremely limited." *Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022). If the ALJ's decision is supported by substantial evidence, the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. See 42 U.S.C. § 405(g). The substantial evidence standard is not a high hurdle to negotiate. *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019); *Albert v. Kijakazi*, 34 F.4th 611, 614 (7th Cir. 2022). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). To determine whether substantial evidence exists, the court reviews the record as a whole, but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving debatable evidentiary conflicts, or determining credibility. *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022); *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). Where reasonable minds could differ on the weight of evidence, the court defers to the ALJ. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021); *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020).

But, in the Seventh Circuit, the ALJ also has an obligation to build an accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir.2010). The court has to be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). The Seventh Circuit has explained that, even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build that logical bridge. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)("... we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."); *see also Jarnutowski*, 48 F.4th at 774 ("... the Commissioner argues, we should affirm the ALJ's decision because it was supported by the evidence. Possibly. But we cannot reach that conclusion from the ALJ's analysis."); *but see, e.g., Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018)("But we need not address either of those issues here because, even if [plaintiff] were correct on both counts, we may affirm on any basis appearing in the record,....."); *Steimel v. Wernert*, 823 F.3d 902, 917 (7th Cir. 2016)("We have serious reservations about this decision, which strikes us as too sweeping. Nonetheless, we may affirm on any basis that fairly appears in the record."); *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012)("[District court] did not properly allocate the burden of proof on the causation element between the parties,...No matter, because we may affirm on any basis that appears in the record.").

Of course, this is a subjective standard, and a lack of predictability comes with it for ALJs hoping to write opinions that stand up to judicial review. One reviewer might see an expanse of deep water that can only be traversed by an engineering marvel like the Mackinac Bridge. Another might see a trickle of a creek they can hop across with barely a splash.[2] But, the Seventh Circuit has also called this requirement "lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). All ALJs really need to do is "minimally articulate" their reasoning. *Grotts v. Kijakazi*, 27 F.4th 1273, 1276 (7th Cir. 2022); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016). "If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985).[3] The ALJ has "done enough" here.

---

[2] A perfect example is the aforementioned *Jarnutowski.* There, two judges on the panel felt the ALJ had not adequately explained aspects of her reasoning, 748 F.4th at 774-77, while a third judge, dissenting, thought she did. 748 F.4th at 77-79. The Magistrate Judge who reviewed the ALJ's decision at the district court level also felt the ALJ had adequately explained her reasoning. *Donna J. v. Saul*, No. 19 C 2957, 2021 WL 2206160, at *8 (N.D. Ill. June 1, 2021).

[3] Prior to *Sarchet*'s "logical bridge" language, the court generally employed the phrase "minimal articulation" in describing an ALJ's responsibility to address evidence. *Zalewski v. Heckler*, 760 F.2d 160, 166 (7th Cir. 1985)(collecting cases). The court's focus was on whether an ALJ's opinion assured the reviewing court that he or she had considered all significant evidence of disability. In *Zblewski v. Schweiker*, 732 F.2d 75 (7th Cir. 1984), for example, the court "emphasize[d] that [it] d[id] not require a written evaluation of every piece of testimony and evidence submitted" but only "a minimal level of articulation of the ALJ's assessment of the evidence...in cases in which considerable evidence is presented to counter the agency's position." *Zblewski*, 732 F.2d at 79. In *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985), the court rejected a plaintiff's argument that an ALJ failed to adequately discuss his complaints of pain and was more explicit about how far ALJs had to go to explain their conclusions:

We do not have the fetish about findings that [the plaintff] attributes to us. The court review judgments, not opinions. The statute requires us to review the quality of the evidence, which must be "substantial," not the quality of the ALJ's literary skills. The ALJs work under great burdens. Their supervisors urge them to work quickly. When they slow down to write better opinions, that holds up the queue and prevents deserving people from receiving benefits. When they process cases quickly, they necessarily take less time on opinions. When a court remands a case with an order to write a better opinion, it clogs the queue in two ways—first

(continued...)

**III.**

The plaintiff has a long list of issues with the ALJ's decision, which he breaks down into three topics: (1) "Without any support whatsoever, the ALJ insisted that her RFC assessment adequately accommodates all of Plaintiff's non-exertional functional deficits"; (2) "The ALJ failed to support her assessment of medical opinion evidence with substantial evidence"; (3) "The ALJ premised her rejection of Plaintiff's subjective statements largely upon unsupported inferences and an improper predisposition to find him not credible." Each topic includes multiple sub-arguments, some of which the plaintiff appears to be more serious about than others. [*See, e.g.*, Dkt. # 12, at 7("as a threshold matter . . . ."), at 8 ("The real harm, however, occurs later . . . .")]. With so very many criticisms of the ALJ's opinion slotted into each major topic, it is tempting to cast many of them aside as no more than "nit-picking." *Poole v. Kijakazi*, 28 F.4th 792, 797 (7th Cir. 2022)(". . . courts should not nitpick ALJ decisions 'in quest of a perfect opinion' . . . ."); *Gedatus*, 994 F.3d at 901. But, the court will do its best in attempting to go through each of the plaintiff's many bones of contention one by one.[4]

---

[3](...continued)
because the new hearing on remand takes time, second because it sends the signal that ALJs should write more in each case (and thus hear fewer cases).

The ALJ's opinion is important not in its own right but because it tells us whether the ALJ has considered all the evidence, as the statute requires him to do....This court insists that the finder of fact explain why he rejects uncontradicted evidence. One inference from a silent opinion is that the ALJ did not reject the evidence but simply forgot it or thought it irrelevant. That is the reason the ALJ must mention and discuss, however briefly, uncontradicted evidence that supports the claim for benefits.

*Stephens*, 766 F.2d at 287 (citations omitted). Much more recently, the Seventh Circuit explained that "the 'logical bridge' language in our caselaw is descriptive but does not alter the applicable substantial-evidence standard." *Brumbaugh v. Saul*, 850 F. App'x 973, 977 (7th Cir. 2021).

[4] Briefs with so many assignments of error can make it difficult to sift important points from those
(continued...)

A.

**"Without any support whatsoever, the ALJ insisted that her RFC assessment adequately accommodates all of Plaintiff's non-exertional functional deficits" [Dkt. #12, at 7-11].**

The plaintiff begins this topic by claiming that the ALJ:

did not mention that the neuropsychological examiner documented mild left temporal lobe dysfunction, possibly related to seizures, and identified inconsistencies in attention and processing speed abilities that suggested more broad frontal-subcortical dysfunction, likely due to physical pain, mood dysregulation, effects of anti-epileptic medications, sleep dysfunction, chronic cannabis use, and other factors.

[Dkt. #12, at 8]. But, an ALJ "is not required to mention every piece of evidence." *Jeske v. Saul*, 955 F.3d 583, 593 (7th Cir. 2020). The important thing is that the ALJ "confront the evidence that does not support her conclusion and explain why that evidence was rejected." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). Here, the ALJ clearly discussed the February 3, 2021 evaluation, noting the decreased verbal memory as well as variable attention/working memory and processing speed. (R. 29). The ALJ twice noted left temporal lobe dysfunction as shown by a November 2-4, 2021 electroencephalogram: once, in discussing the study itself and once discussing the medical expert's reading of it. (R. 29, 32). One wonders why the plaintiff thinks an evaluation indicating a "mild" dysfunction somehow undermines the ALJ's finding that plaintiff had a "moderate" limitation in concentration, persistence, and pace. Perhaps the plaintiff is arguing that the ALJ ought

---

[4](...continued)

that don't merit discussion. *See United States v. Friedman*, 971 F.3d 700, 710 (7th Cir. 2020)("[A] brief that treats more than three or four matters runs a serious risk of becoming too diffused and giving the overall impression that no one claimed error can be very serious."); *Burnam v. Colvin*, 525 F. App'x 461, 464 (7th Cir. 2013).The risk of a strategy like this for a plaintiff, of course, is that the court will miss the one or two truly salient arguments. *See United States v. Lathrop*, 634 F.3d 931, 936 (7th Cir. 2011)(brief that presents a dozen claims of error "effectively ignor[es] our advice that the equivalent of a laser light show of claims may be so distracting as to disturb our vision and confound our analysis.").

to have found that he was merely mildly limited in that area. That seems unlikely, but plaintiffs have been known to make similarly "quizzical" arguments. *See, e.g.,Karla J.B. v. Saul*, 2020 WL 3050220, at *4 (N.D. Ill. 2020); *see also Anthony L. v. Kijakazi*, No. 20 CV 5184, 2022 WL 2237141, at *4 (N.D. Ill. June 22, 2022); *David C. v. Kijakazi*, No. 20-CV-3891, 2022 WL 602520, at *11 (N.D. Ill. Mar. 1, 2022); *Patrick C. v. Saul*, No. 20 C 608, 2020 WL 6287370, at *8 (N.D. Ill. Oct. 27, 2020).

It has to be said that the plaintiff hasn't made a terribly accurate representation of the piece of evidence he claims the ALJ ignored. What the examiner actually said was clinical testing "*suggested* mild left temporal lobe dysfunction, possibly related to seizures . . . ." (R. 1061 (emphasis added)). And, as it happens, it is the *plaintiff* who ignores significant findings elsewhere in the report. The examiner stated that "[c]ollectively, his attention and processing speed abilities were functional, though variable . . . ." (R. 1061). The examiner went on to note that "the majority of plaintiff's cognitive functions were normal and indicated the capacity for engagement in academic and occupational responsibilities, particularly with improved mental health status." (R. 1062). We're not sure if the plaintiff read through those portions of the evidence he claims the ALJ ignored, but that sounds like someone who can work despite his impairments. And that's evidence to support the ALJ's findings.

The plaintiff next complains that "[t]he ALJ also did not mention that the examiner noted high levels of psychiatric distress, chronic physical pain, and a possible maladaptive stress-response pattern (namely avoidance), and that he opined that Plaintiff's prognosis is fair if he could develop coping strategies and other improved psychological functions." [Dkt. #12, at 8]. Contrary to plaintiff's claim, the examiner did not observe that plaintiff had "high levels of psychiatric distress,

chronic physical pain", but offered that one might have such symptoms *if* one suffered stress and trauma during childhood. (R. 1062). Indeed, the examiner said plaintiff's report of and excessive number of psychological symptoms during the assessment was exaggerated and invalid. (R. 1061).

Plaintiff then complains that the ALJ "did not mention that the examiner recommended monitoring of Plaintiff's cognition over time, ongoing therapy, and updated neuroimaging for additional etiological clarification of cognitive deficits." [Dkt. #12, at 8]. A recommendation that one engage in therapy and monitor his condition does not mean his is disabled. Moreover, it would appear that the examiner was unaware that the plaintiff had video electroencephalogram testing just a couple of months prior to the assessment. The plaintiff seems to have told the examiner that his most recent study was back in 2018. (R. 1059).

Next, plaintiff claims that the "specific elements from the neuropsychological report suggest far more dire deficits than the ALJ suggested." [Dkt. #12, at 8]. But the plaintiff fails to explain how or what, exactly, is so "dire" about the examiner's findings. Again, the examiner said the majority of plaintiff's cognitive functions were normal and allowed for academic pursuits and employment. (R. 1062). No disability stemmed from his attention and processing speed abilities – they were "functional." (R. 1061). Indeed, the examiner recommended that plaintiff get out and "engage[] in purposeful/meaningful activity . . . ." (R. 1062). There's nothing "dire" about any of that.

After all that, the plaintiff still has one more problem with the ALJ's consideration of the February 3, 2021 assessment: the plaintiff takes offense at the ALJ's mention of his marijuana use:

> In addition, though she mentioned that he had used cannabis on the testing date, it is pure conjecture on her part to suggest that it had any effect on Plaintiff's functioning.

[Dkt. #12, at 8]. That's a rather remarkable assertion. There was no "conjecture" on the ALJ's part,

pure or adulterated. She was merely reading the examiner's findings, and surely she's allowed to do that. The examiner reported that plaintiff actually had a 2mg edible before the examiner's testing and smoked two joints during breaks in the testing. (R. 1060). The examiner even noted that plaintiff felt conflicted about performing his best due to his disability claim. (R. 1061). And it was the examiner, not the ALJ, that suggested that plaintiff would function better if he did not smoke quite so much marijuana, specifically recommending – not once, but twice – that plaintiff cut back on his excessive marijuana use to improve his functioning. (R. 1062).

After taking the court through all that criticism, the plaintiff finally gets to what he feels was the "real harm." The plaintiff first complains that the ALJ did not provide a sufficiently thorough assessment of the paragraph B functional areas. [Dkt. #12, at 8]. But, the ALJ engaged in thorough review of the psychological evidence, including records of counseling from the Pilsen Wellness Center (R. 26-27, 27, 28) and neuropsychological testing. (R. 29). It's unclear what more the ALJ ought to have done, but if the plaintiff is simply disagreeing with how the ALJ assessed those records, a court cannot reweigh the evidence to arrive at a conclusion the plaintiff wants. *Jarnutowski*, 48 F.4th 769, 2022 WL 4126293, *3 (7th Cir. 2022); *Reynolds*, 25 F.4th at 474.

Indeed, the plaintiff next asserts that "[t]he record *overwhelmingly* supports a finding that, as a result of Plaintiff's seizures, mental impairments, and chronic pain—whatever the etiologies—he has work-preclusive deficits in functioning." [Dkt. #12, at 9 (emphasis added)]. That claim strangely ignores the findings in the neuropsychological assessment that plaintiff was so concerned about in the previous section. Again, the examiner, after lengthy testing, found plaintiff functioned well enough for work or academics. The medical expert who reviewed the plaintiff's medical files and testified at the hearing felt the plaintiff could perform light work – with the

exception of driving, working at heights, or around dangerous machinery – could occasionally lift overhead with his right arm, and could frequently climb ramps/stairs, stoop, crouch, crawl, and balance. (R. 33, 73-74). State agency reviewers who reviewed the plaintiff's medical file before the February 2021 neuropsychological assessment found plaintiff could recall and follow simple one and two-step directions on a consistent basis during a usual workday. (R. 131, 163). It hardly seems that the evidence is "overwhelming" in favor of disability. And, recall that the ALJ's decision denying benefits need only be supported by "substantial evidence," which need not even amount to a preponderance of evidence. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir.2007).

Of course, if there *is* overwhelming evidence, it's up to the plaintiff to direct the court to it. *See, e.g., Kaplarevic v. Saul*, 3 F.4th 940, 943 (7th Cir. 2021)( "It was [plaintiff's] burden to show disability, and if he wanted to do so, he should have . . . identif[ied] the portions of the medical records that he believed supported various of [his] allegations."); *Fanta v. Saul*, 848 F. App'x 655, 659 (7th Cir. 2021)("[Plaintiff] does not point to any objective evidence or medical opinions in the record that support stricter limitations."); *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013)(". . . the burden was on [plaintiff] to explain why she was disabled as a result of her depression."). In this regard, the plaintiff says that the ALJ:

> neglected to mention the findings of the consultative psychiatric examiner that Plaintiff presented as aloof and upset, with agitated mannerisms, and that examination revealed loose, tangential, and slow speech, impoverished and confused thought processes, and that he was not well oriented. R. 573-576. The ALJ neglected to mention, oddly, that the examiner specifically opined that Plaintiff, who was 28 years old at the time, could not manage his own funds, and would have to rely upon his parents to do so. Id."

[Dkt. #12, at 9]. But, the records the plaintiff cites, at pages 573-76, come from plaintiff's treating physician, Dr. Ahmer Ali. On March 28, 2018, Dr. Ali reported that mental status exam was normal, cranial nerves exam was normal, motor-relex-sensory exam was normal, and coordination and gait were normal. (R. 575-76). An MRI taken February 26, 2018, was "suspicious for mild left mesial temporal sclerosis." (R. 576). EEGs had not shown any evidence of left temporal epilepsy, only or generalized seizures. (R. 576). On May 30, 2018, mental status, neurological, and physical exams were, again, all normal. (R. 573). Obviously, these normal exam results and what was perhaps an MRI finding of a mild issue clearly do not match up with plaintiff's claims nor do they undermine the ALJ's finding that plaintiff was not disabled.

Plaintiff also points the court to "notes from Pilsen at that time also reflect increased anxiety and frustration over an inability to obtain Xanax, and that, improvement notwithstanding, mental status examinations revealed impulsive symptoms. R. 932, 933, 940." [Dkt. #12, at 9-10]. It's unclear how frustration and impulsive symptoms, without more, could trump all of the foregoing evidence already discussed, and discussed in the ALJ's opinion. In nearly every category of functioning – which is what this is about – the plaintiff's problems were rated as no more than "0" or "1", meaning meriting only "watchful waiting" as opposed to "need for action" or "immediate/intensive action". (R. 929-31).

The plaintiff then claims the ALJ failed "to factor in the ECG testing from November 2020, which revealed intermittent slowness over the left front temporal area suggesting neurophysiologic dysfunction of the region. R. 1886-1887." [Dkt. #12, at 10]. The ALJ did mention the results of that testing in her opinion. (R. 29). The ALJ went a bit farther than the plaintiff does, however, asking the medical expert for an interpretation, which was that the testing, done while withholding seizure

13

medication and under sleep deprivation, showed no epileptiform discharges or electroencephalogram seizures." (R. 29, 65-66). Plaintiff does not suggest what functional limitations the ALJ ought to have drawn for that and, again, evidence regarding *functional* limitations tends to show normal o at least adequate functioning. It the plaintiff thought that ECG meant something more than the medical expert did, it was up to the plaintiff to come forward with evidence to support some additional limitation. *Gedatus*, 994 F.3d at 905; *Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019). As for plaintiff's pain, which was difficult for doctors to pinpoint, the ALJ explained that she limited plaintiff to light work with additional postural restrictions. (R. 37). Plaintiff has neither hypothesized any additional limitations that would be necessary nor has he pointed to medical evidence or opinion setting forth any such limitations. Again, it was up to him to do so. *Gedatus*, 994 F.3d at 905; *Jozefyk*, 923 F.3d at 498.

Finally, the plaintiff argues that the ALJ improperly accounted for his moderate limitations in concentration, persistence, and pace by restricting him to "simple, repetitive tasks" without explaining how such restrictions account for the individual's mental deficits. [Dkt. #12, at 11]. But "moderate limitations, on their own, do not mean a claimant is disabled." *Apke v. Saul*, 817 F. App'x 252, 258 (7th Cir. 2020); *see also Capman v. Colvin*, 617 Fed. Appx. 575, 579 (7th Cir. 2015) ("A moderate limitation is not a complete impairment."). As the Seventh Circuit has held, a "moderate limitation" is defined by regulation to mean that functioning in that area is "fair," 20 C.F.R. Pt. 404, Subpt. P, App. 1, and "fair" in ordinary usage does not mean "bad" or "inadequate." *Pavlicek*, 994 F.3d at 783. "So a 'moderate' limitation in performing at a consistent pace seems consistent with the ability to perform simple, repetitive tasks at a consistent pace." *Pavlicek*, 994 F.3d at 783.

**B.**

**"The ALJ [allegedly] failed to support her assessment of medical opinion evidence
with substantial evidence" [Dkt. #12, at 11-13]**

The plaintiff begins this topic by accusing the ALJ of "defying logic" because she "relied almost entirely upon the opinion ventured by Dr. Goldstein, the testifying medical expert (ME), even though he testified primarily to his uncertainty about the case, rather than undermining Plaintiff's deficits." [Dkt. #12, at 11]. It is anything but clear how the ALJ's reliance on the opinion of a medical expert "def[ies] logic." Plaintiffs routinely accuse ALJs of playing doctor when they review and discuss medical evidence. *See, e.g., Sarah M. v. Kijakazi*, No. 21 CV 2454, 2022 WL 3139566, at *7 (N.D. Ill. Aug. 5, 2022); *Gina V. v. Kijakazi*, No. 20 C 4009, 2022 WL 1457801, at *5 (N.D. Ill. May 9, 2022); *Abraham A. v. Kijakazi*, No. 20 C 3439, 2022 WL 313758, at *3 (N.D. Ill. Feb. 2, 2022); *Stephanie H. v. Comm'r of Soc. Sec.*, No. 20 C 4600, 2021 WL 2986298, at *6 (N.D. Ill. July 14, 2021); *Dawn J. v. Saul*, No. 19 CV 6903, 2021 WL 2894165, at *2 (N.D. Ill. July 9, 2021). Well, "[t]he use of a medical expert can help ALJs resist the temptation to 'play doctor' ... by evaluating medical evidence on his or her own." *Apke v. Saul*, 817 F. App'x 252, 257 (7th Cir. 2020). *Mandrell v. Kijakazi*, 25 F.4th 514, 518 (7th Cir. 2022)(". . . some of the explanations he did offer strayed beyond his expertise as an adjudicator and into the forbidden territory of 'play[ing] doctor.'"); *Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014)("This mistaken reading of the evidence illustrates why ALJs are required to rely on expert opinions instead of determining the significance of particular medical findings themselves.").

Here, the ALJ was tasked with going through a medical record regarding a seizure disorder that included a number of technical studies like CTs and EEGs, most of which were normal. (R. 21,

22, 23, 24). It seems logical to have relied on a doctor who is, as the ALJ noted, a neurologist.[5]

Dr. Goldstein noted that there was little definitive evidence among those studies of a seizure disorder, with the exception of one study showing a spike wave. The doctor explained that the study showing the left temporal issue was likely something focal, but not evidence of seizures. (R. 58-59). Aside from those studies, EEGs were normal, so it was unclear what plaintiff was experiencing. (R. 60). Dr. Goldstein noted plaintiff's excessive marijuana use, and thought it was possible his problems were metabolic, or related to plaintiff's former heroin abuse, or even to other prescription medication he was taking. (R. 61, 62, 66). The doctor explained that the more normal studies there are, as in this case, the less likely there is a seizure disorder. But studies and the doctors interpreting them could never rule it out 100%. (R. 70). So the medical expert's testimony wasn't "equivocal" as the plaintiff puts it [Dkt. #12, at 12]; the medical evidence in this case was equivocal because it did not necessarily confirm that plaintiff had a seizure disorder. Even plaintiff's own treating physician suspected syncope, a vasovagal episode, noting normal studies and neurological findings. (R. 456-57, 458, 465, 467). And, more importantly, after reviewing the record, the medical expert was not "equivocal" at all about the plaintiff capacity to perform light work with a few postural limitations. (R. 73-74).

The plaintiff then complains that the ALJ relied on "uncompelling boilerplate reasons to undermine the opinions of several treating therapists . . . Though each one of the opinions corroborated the existence of "marked" deficits in functioning, particularly in concentration." (R.

---

[5] The plaintiff appears to question whether Dr. Goldstein's specialization in neurology should add any weight to his opinion. [Dkt. #12, at 12]. Without any explanation of why that would be the case, it's just another unsupported bit of nit-picking. If plaintiff wanted to question whether Dr. Goldstein was qualified to testify about seizure activity, the time to do so was at the hearing. But, plaintiff's counsel declined to do so. (R. 58).

[Dkt. #12, at 12].  The opinions came by way of a checkbox form provided by plaintiff's attorney. (R. 448).  These types of checklist observations cannot be ignored, but they are less useful to a determination of disability than a doctor's narrative summary.  *See, e.g., Trottier v. Saul*, 809 F. App'x 326, 327 (7th Cir. 2020)(criticizing doctor's opinion expressed by checking boxes rather than explaining how medical evidence supported his conclusions); *Urbanek v. Saul*, 796 F. App'x 910, 915 (7th Cir. 2019)(questioning persuasive value of a checklist opinion); *Varga*, 794 F.3d at 816 (checklist observations are ... "less useful to an ALJ" than a doctor's narrative summary); *Schmidt*, 496 F.3d at 843 ("... the "Functional Capacity Questionnaire" on which [the doctor] stated that [plaintiff] could not perform sedentary work is suspect because [plaintiff's] attorney apparently drafted it and it did not include any new medical evidence or any other basis to justify these more extreme limitations."); *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001)("... [the doctor] expressed this opinion by writing 'yes' next to a question that [plaintiff's] attorney had pre-typed. [The doctor] did not elaborate on the basis for this opinion.").

First there is a form from Arham Nezami, but his qualifications are unknown.  As the ALJ said, we don't know what he does.  In any event, he said he saw plaintiff from December 2020 to March 2021, once per week, for an hour.  (R. 1675, 1677).  He said plaintiff's illness did not markedly restrict his cognitive functioning. (R. 1675).  He said plaintiff reported feeling overwhelmed when waiting in a line, losing focus when under stress.  Plaintiff also said he was able to drive his parents around and would be able to work at a desk job.  (R. 1677).  Plaintiff doesn't specifically mention the ALJ's treatment of this report.  That's probably because contrary to plaintiff's assertion that every therapist who offered an opinion found plaintiff markedly restricted, and because Mr. Nezami – like Dr. Goldstein and the neuropsychologist – didn't think anything was

preventing plaintiff from working.

The next form came from Ms. Moquin, a social worker who said she began seeing plaintiff on August 27, 2021, although she filled out the form on March 18, 2021. (R. 1679, 1681). She saw plaintiff once a week. She said encounters with people or family, stress, and travel all triggered depression or anxiety. (R. 1679). She said plaintiff was markedly restricted in the areas of cognitive functioning, interaction with others, and sustaining concentration, persistence, and pace. (R. 1681). She diagnosed plaintiff with bipolar disorder and epilepsy. (R. 1679, 1681). The ALJ rejected her opinion because it was not clear how long she had seen plaintiff, because it was unsupported by treatment notes, and because the diagnoses she made were outside of her expertise. (R. 35).

Those aren't "uncompelling boilerplate reasons." Clearly, a social worker has no business offering medical diagnoses. Social workers and therapists are not acceptable medical sources. *See Grotts*, 27 F.4th at 1277; *Winsted v. Berryhill*, 923 F.3d 472, 478 (7th Cir. 2019). And, just as clearly, one cannot assess how familiar a social worker is with a client, if she does not provide an accurate timeline for their therapy. *See Winsted*, 923 F.3d at 478. Plaintiff complains that it was up to the ALJ to contact Ms. Moquin and have her correct her mistake, but plaintiff's attorney provided Ms. Moquin with the form, and she sent it back to him. (R. 448). He should have reviewed the form before passing it on to the ALJ. *See Summers v. Berryhill*, 864 F.3d 523, 527 (7th Cir. 2017)(plaintiff represented by counsel is presumed to have made their best case for benefits); *Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007). And, of course, it was entirely proper for the ALJ to reject an opinion that was unsupported by any treatment notes. Such an opinion is of little value. *Prill v. Kijakazi*, 23 F.4th 738, 751 (7th Cir. 2022); *Zoch*, 981 F.3d at 602. The plaintiff thinks that it was up to the ALJ to contact Ms. Moquin and explain to her that she could not accept her opinion

without some tie to treatment records [Dkt. #12, at 13], but again, the form came from plaintiff's counsel and was returned to him when completed.

Lastly, there is the form from Cassandra Gennuso, a Licensed Clinical Professional Counselor, who saw plaintiff weekly from March 2019 to March 2020. (R. 1896). She said that plaintiff was anxious in large groups of people or waiting in line, was unable to meet productivity goals typical for someone his age because tasks took him longer to complete, and that he was unable to sit in a car for a long period of time and could not drive due to epilepsy. (R. 1896). Plaintiff was not markedly restricted in cognitive functioning, however. (R. 1896). He was markedly restricted in being able to interact with people for more than two to three hours, and was markedly restricted in maintaining concentration, persistence, and pace, explaining that he frequently failed to do "homework assignments" between sessions, and did them at the session instead. (R. 1897). Despite this, Ms. Gennuso said plaintiff had responded well to treatment. (R. 1897).

As the plaintiff allows, the ALJ found the same defects with Ms. Gennuso's report as she did with Ms. Moquin's. Most importantly among those, as with Ms. Moquin, there are no treatment notes to support her findings. Again, it was entirely proper for the ALJ to reject her report on that basis. *Prill*, 23 F.4th at 751; *Zoch*, 981 F.3d at 602. And, as the ALJ suggested, how can Ms. Gennuso offer any assessment of plaintiff's concentration on homework assignments unless she is at home with him? Plaintiff purportedly performed these same assignments at his sessions with Ms. Gennuso, but she offers no commentary on what she observed.

19

## C.

**"The ALJ premised her rejection of Plaintiff's subjective statements largely upon unsupported inferences and an improper predisposition to find him not credible" [Dkt. #12, at 13-15]**

Finally, we come to the plaintiff's issues with the ALJ's finding that, overall, the plaintiff's allegations regarding his limitations were not credible. The ALJ is in the best position to determine a witness's truthfulness and forthrightness. *Stepp v. Colvin*, 795 F.3d 711, 720 (7th Cir. 2015); *Shideler v. Astrue*, 688 F.3d 306, 310–11 (7th Cir.2012). As such, a reviewing court will not overturn an ALJ's credibility finding unless the plaintiff can show that it is "patently wrong." *Grotts*, 27 F.4th at 1279; *Deborah M. v. Saul*, 994 F.3d 785, 789 (7th Cir. 2021); *McHenry v. Berryhill*, 911 F.3d 866, 874 (7th Cir. 2018). That is a "heavy burden," *Milliken v. Astrue*, 397 F. App'x 218, 225 (7th Cir. 2010); *Turner v. Astrue*, 390 F. App'x 581, 587 (7th Cir. 2010), and the plaintiff has not met it here.

The plaintiff complains that the ALJ repeatedly emphasized unremarkable objective findings, [Dkt. #12, at 13], but does not argue that there were no such findings. There were, and "discrepancies between the objective evidence and self-reports may suggest symptom exaggeration." *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010); *Schmidt*, 395 F.3d at 746–47. See 42 U.S.C. § 423(d)(5)(A) ("An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability...."); 20 C.F.R. §§ 404.1529(a); 416,929(a) ("[S]tatements about your pain or other symptoms will not alone establish that you are disabled."). The plaintiff "bears the burden to prove she is disabled by producing medical evidence."); *see also Zoch*, 981 F.3d at 601. The plaintiff "bears the burden to prove she is disabled by producing medical evidence." *Gedatus*, 994 F.3d at 905; *Karr*, 989 F.3d at 513 (7th Cir. 2021)(plaintiff must "identify[ ] ...

20

objective evidence in the record" that she is disabled).

The plaintiff also has a problem with the ALJ making references to his regular, daily cannabis use. [Dkt. #12, at 13, 15]. The plaintiff has claimed that it was prescribed by his treating physicians for his seizures (R. 779), but cannabis is not on any of the lists of prescription drugs from those treating doctors. (R. 546-47, 597-602, 898, 1126-28, 1157-58). Indeed, those treating physicians made reference to plaintiff's Xanax and marijuana abuse (R. 655). The neuropsychological examiner recommended reduction of marijuana use to improve function. (R. 1062). The medical expert testified regarding plaintiff's excessive marijuana use, and thought it was possible his problems were metabolic, or related to plaintiff's former heroin abuse, or even to other prescription medication he was taking. (R. 61, 62, 66). The plaintiff's cannabis use is woven throughout the record, and mentioned as potentially underlying his problems. It would have been foolhardy for the ALJ to have ignored it, despite plaintiff's wishes that she had.

The plaintiff asserts that the "medical record unequivocally supports a finding of severe seizure disorder. It reflects ongoing sporadic seizures since the onset date, some of which were witnessed in doctors' offices and at the hospital." [Dkt. #12]. The former assertion is true. Indeed, the ALJ found as much. (R. 18). But seizure disorders, like any impairment, are not necessarily disabling. Diagnosis is not disability. *Schmidt*, 395 F.3d at 746; *Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998). What matters is the severity of the condition and how it limits a plaintiff's capacity to work based on clinical and/or laboratory findings. *See Elder*, 529 F.3d at 415 ("... it makes no difference if [plaintiff] saw [his doctor] "every two-and-a-half months" ... what does matter is that [his doctor] did not confirm the severity of [plaintiff's impairment] with medical examinations or tests."); *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004)("The issue in the case

is not the existence of these various conditions of hers but their severity....").

The latter assertion, that plaintiff had a number of seizures witnessed in doctors' offices, is not true. There was one seizure witnessed at a hospital, on August 29, 2017 (R. 556, 559), but that is all. The handful of records the plaintiff cites confirm only that. One of the records is nothing more than plaintiff claiming to a therapist on January13, 2020 that he had a few grand mal seizures a month. (R. 883-884). There is nothing to confirm that; as already discussed, most objective studies were normal, as were neurological exams, in the main.

The plaintiff also takes the ALJ to task for what he says was equating his daily activities with the demands of holding a job. [Dkt. #12, at 15]. But, what the ALJ actually did was note that plaintiff testified – and noted in his written statement – that he is so disabled that he must spend nearly all his time in bed, every day. (R. 31, 366). As the ALJ explained, that certainly does not jibe with taking public transportation to get methadone or attending recovery meetings or therapy sessions. (R. 27, 31). As such, the ALJ did not improperly rely upon plaintiff's daily-living activities when evaluating whether he was disabled and certainly did not equate activities of daily living with those of a full-time job. *Jesse*, 955 F.3d at 592; *Alvarado v. Colvin*, 836 F.3d 744, 750 (7th Cir. 2016).

Beyond that, the record is replete with inconsistent statements and contradictions, many of which the ALJ worked to distill from the record and detail. (R. 26-27, 31-32). For example, the plaintiff also told therapists he drove his parent around, and would be able to work at a desk job (R. 1677), or that he drove all the time (R. 1641) and yet claimed he was unable to drive due to epilepsy. (R. 1896). As another example, he said he had several seizures every month but he also claimed to be seizure-free for months on end. (R. 26-27). One could go on. And while it is true that ALJs are

22

not in the business of denying benefits based on a plaintiff's character, they must continue to assess the credibility of plaintiff's allegation. *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016). Consideration of inconsistent statements – especially a pattern as oppose to a mistake or two – are, as always, a part of such consideration. *Grotts*, 27 F.4th at 1278; *Wright v. Kijakazi*, No. 20-2715, 2021 WL 3832347, at *5 (7th Cir. Aug. 27, 2021); *Jesse*, 955 F.3d at 592.

### D.

In the end, the record in this case and the ALJ's decision call to mind the recent Seventh Circuit Opinion about another young applicant with a seizure disorder, who had never worked. As the Court said there: "[t]he ALJ's determination effectively requires [plaintiff] to try to get a job and give work a shot. If working proves beyond [plaintiff's] capacity, [ ]he can apply again for Social Security benefits." *Albert*, 34 F.4th at 617.

### CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment [Dkt. #13] is granted and the ALJ's decision is affirmed.

ENTERED: _____
                    UNITED STATES MAGISTRATE JUDGE

**DATE:** 11/18/22

23